UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COTIVITI, INC.,

                              Plaintiff,

            – against –

CORY DEAGLE, REBECCA
HUSBAND, BRIAN RUBIO, TOM
MAGNOTTA, and SCOTT RATHKE,

                              Defendants.

**OPINION & ORDER**

20 Civ. 2730 (ER)

RAMOS, D.J.:

Cotiviti, Inc. ("Cotiviti") brings this action against its former employees Cory Deagle, Rebecca Husband, Brian Rubio, Tom Magnotta, and Scott Rathke (collectively, "Defendants"), all of whom now work for one of its competitors, for breach of their employment agreements and related claims. Pending before this Court is Defendants' motion to dismiss and to award costs under Federal Rules of Civil Procedure 12(b)(6) and 41(d), respectively. For the reasons discussed below, Defendants' motion to dismiss is GRANTED in part and DENIED in part, and Defendants' motion for costs is GRANTED.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

Cotiviti, a Delaware corporation with its principal place of business in Georgia, provides payment accuracy and spend-management solutions to public and commercial health plans in the United States, Canada, and India. Doc. 21, ¶¶ 2, 6. Cotiviti previously employed Cory Deagle of Utah, Rebecca Husband of Kentucky, Brian Rubio

---

[1] This factual summary is derived from the Amended Complaint and the parties' submissions in connection with the instant motion.

and Tom Magnotta of Pennsylvania (collectively, the "RSU Defendants"),[2] and Scott Rathke of Florida. *Id.*, ¶¶ 2, 10–14. Each of the Defendants held senior leadership positions with Cotiviti, directly communicated with clients, developed and were privy to sensitive business strategies, and had access to Cotiviti's trade secrets. *Id.*, ¶¶ 2, 38. Cotiviti's trade secrets are not known to its competitors but would be of significant value to them if acquired. *Id.*, ¶ 35.

Defendants each entered into agreements with Cotiviti containing similar non-compete, non-solicitation, and non-disclosure clauses. On June 24, 2016, Rathke executed a Non-Disclosure, Non-Solicitation, and Non-Compete Agreement (the "Rathke Agreement"). *Id.*, ¶ 39. In 2017 and 2018, the RSU Defendants each executed the Restricted Stock Unit Award Agreement ("RSU Agreement") as part of Cotiviti's 2016 Equity Incentive Plan ("Incentive Plan"). *Id.*, ¶ 44. In consideration of the RSU Defendants' participation in the Incentive Plan and receipt of restricted stock units ("RSU Award"), Defendants agreed to Exhibit A of the RSU Agreement, which contains restrictive covenants ("RSU Restrictive Covenants"). *Id.*, ¶ 47. The value of the RSU Awards at the time the stocks were given was over $5,000 for Rubio, $33,000 for Husband, $59,000 for Deagle, and $80,000 for Magnotta. Doc. 21, ¶¶ 55, 57, 59, 61.

The Rathke Agreement and the RSU Restrictive Covenants have substantially similar provisions barring (1) disclosure or misappropriation of trade secrets under state trade secrets laws, (2) solicitation of clients and employees, and (3) the provision of "substantially similar professional services" to Cotiviti competitors. The trade secrets provision of the Rathke Agreement states:

> Trade Secrets. You acknowledge the protections provided to Cotiviti's Trade Secrets under applicable law, including the protections afforded by the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. § 35-50 et seq. (the "Act"). You agree not to disclose or

---

[2] The abbreviation "RSU" refers to restricted stock units, which were given to this group of defendants in exchange for their agreement to conditions related to their employment, as discussed *infra*.

> misappropriate any Cotiviti Trade Secrets for so long as such mate-
> rials or information constitutes trade secrets under the Act.  For pur-
> poses hereof the term "Trade Secret" is defined in the Act.

Doc. 21 ex. A, § 2.  The Rathke Agreement's non-solicitation clauses state:

> Non-Solicitation of Customers.  During the term of your employ-
> ment with Cotiviti and for a period of two (2) years following the
> termination of such employment for whatever reason, you shall not
> (except on behalf of Cotiviti) solicit, either directly or indirectly, any
> Person:  (i) who is a client or who was a client or an actively sought
> prospective client of Cotiviti, (ii) who is located within the Territory
> (as defined in the attached Exhibit A); (iii) with whom you had
> Meaningful Business Contact at any time during the two (2) year
> period ending on the date on which your employment by Cotiviti
> ends (or shorter period, if applicable), (iv) for the purpose of selling
> or otherwise providing to such client or prospective client, any ser-
> vices or products that are substantially similar to or competitive with
> any of the services or products provided by Cotiviti as of the date of
> your solicitation or the termination of your employment, whichever
> is earlier ("Competitive Services"). . . .

> Non-Solicitation of Employees.  You agree that during the term of
> your employment by Cotiviti and for a period of two (2) years there-
> after, you will not directly or indirectly (i) solicit any person who is
> at the time of the solicitation, or was, at any time during the two (2)
> year period ending on the date on which your employment by Co-
> tiviti ends (or shorter period, if applicable), (ii) an employee, agent,
> or independent contractor of Cotiviti, (iii) with whom you had busi-
> ness contact in the course of your employment by Cotiviti, (iv) for
> the purpose of offering employment to such person within the Terri-
> tory with an individual or entity which is engaged in providing or
> selling Competitive Services, (v) for the purpose of providing any
> services which are substantially similar to the services performed by
> such person for Cotiviti.

*Id.*, § 3, 4.  Finally, the non-compete clause provides:

> Non-Compete.  You agree that during the term of your employment
> by Cotiviti and for a period of two (2) years thereafter, regardless of
> the reason for such separation, you will not directly or indirectly
> provide substantially similar professional services within the Terri-
> tory to that part of any Person engaged in selling or providing Com-
> petitive Services.

*Id.*, § 5.

The RSU Restrictive Covenants contain similar clauses:

[1.]f.  Participant acknowledges the protections provided to the Company's Trade Secrets under applicable law.  Participant agrees not to disclose or misappropriate any Company Trade Secrets for so long as such materials or information constitute trade secrets.  For purposes hereof the term "Trade Secret" is defined in the applicable State Trade Secrets Act. . . .

2.  Non-Solicitation of Customers.  During the term of Participant's Service with the Company and for a period of two (2) years following the termination or expiration of Participant's Service with the Company or its Subsidiaries for any reason, Participant shall not (except on behalf of the Company) solicit, either directly or indirectly, any Person: (i) who is a client or who was a client or an actively sought prospective client of the Company, (ii) who is located within the Territory (as defined in Attachment 1); (iii) with whom the Participant had Meaningful Business Contact at any time during the two (2) year period ending on the date on which the Participant's Service with the Company or its Subsidiaries ends (or shorter period, if applicable), (iv) for the purpose of selling or otherwise providing to such client or prospective client, any services or products that are substantially similar to or competitive with any of the services or products provided by the Company as of the date of Participant's solicitation or the termination or expiration of Participant's Service with the Company or its Subsidiaries, whichever is earlier ("Competitive Services"). . . .

3.  Non-Solicitation of Employees.  Participant agree [*sic*] that during the term of Participant's Service with the Company and its Subsidiaries and for a period of two (2) years thereafter, Participant will not directly or indirectly (i) solicit any person who is at the time of the solicitation, or was, at any time during the two (2) year period ending on the date on which Participant's Service with the Company and its Subsidiaries ends (or shorter period, if applicable), (ii) an employee, agent, or independent contractor of the Company, (iii) with whom Participant had business contact in the course of Participant's Service with the Company and its Subsidiaries, (iv) for the purpose of offering employment to such person within the Territory with an individual or entity which is engaged in providing or selling Competitive Services, (v) for the purpose of providing any services which are substantially similar to the services performed by such person for the Company.

4.  Non-Compete.  Participant agrees that during the term of Participant's Service with the Company or its Subsidiaries and for a period of two (2) years thereafter, regardless of the reason for such separation, Participant will not directly or indirectly provide substantially

> similar professional services within the Territory to that part of any
> Person engaged in selling or providing Competitive Services.

Doc. 21 ex. B, §§ 1.f., 2, 3, 4.

The Rathke Agreement and RSU Restrictive Covenants also contain choice of law provisions selecting Connecticut law to construe and enforce the contracts, and forum selection clauses submitting to the exclusive jurisdiction of the federal and state courts in New York. Doc. 21 ex. A, § 7; Doc. 21 ex. B, § 6.

In June 2018, Cotiviti Holdings merged with a company called Verscend to form Cotiviti, Inc. (the "Verscend Merger"). Doc. 26, 8. The terms of the Verscend Merger are outlined in the "Agreement and Plan of Merger" filed with the SEC ("Merger Agreement") and include provisions relating to the Incentive Plan and the RSU Awards. *Id.*, 8–9. Specifically, Section 3.05(b) of the Merger Agreement provides:

> Effective as of immediately prior to the Effective Time, each Com-
> pany RSU Award that remains outstanding and each Company Re-
> stricted Stock Award that remains outstanding and unvested shall (i)
> vest in full, and (ii) by virtue of the Merger and without any action
> on the part of the holders thereof, be cancelled and terminated as of
> immediately prior to the Effective Time and converted into the right
> to receive [a cash payout].

And Section 3.05(d) states Cotiviti's responsibility to:

> [T]ake all necessary action to ensure that the Surviving Corporation
> will not be bound at the Effective Time by any options, stock appre-
> ciation rights, units or other right, awards or arrangements under any
> stock incentive plan of the Company that would entitle any Person
> after the Effective Time to beneficially own any Company Common
> Stock (or any derivative securities thereof) or to receive any pay-
> ments in respect thereof, except as expressly provided in this Agree-
> ment. Prior to the Effective Time, the Company shall take all actions
> that are necessary to provide that, subject to the consummation of
> the Merger, the Company's 2012 Equity Incentive Plan and the
> Company's 2016 Equity Incentive Plan shall terminate effective im-
> mediately prior to the Effective Time.

At various points from April 2018 until June 2019, each of the Defendants left Cotiviti.  Doc. 21, ¶¶ 65, 69, 71, 73, 75.  Ultimately,[3] all of the Defendants accepted employment with or otherwise provided services to HMS Holdings Corp. ("HMS"), a direct competitor to Cotiviti.  *Id.*, ¶ 5.  Cotiviti alleges that at HMS, Defendants now work in capacities similar to the roles they held at Cotiviti.  *Id.*, ¶¶ 67, 70, 72, 74, 76.  Because the Defendants were executives at Cotiviti who developed trade secret information for the company, Cotiviti also alleges that it would be inevitable for the Defendants to make use of those trade secrets at HMS.  *Id.*, ¶ 80.

On October 14, 2019, Cotiviti filed an action in New York state court against Deagle, Husband, Rubio, and another former Cotiviti executive, Timothy Garrett of Georgia (the "State Action").  Doc. 26 ex. A, ¶ 16.  Cotiviti asserted three causes of action:  breach of contract, misappropriation of trade secrets, and unfair competition.  These claims were all based on allegations that these defendants had violated their RSU Restrictive Covenants by soliciting clients and employees, misappropriating trade secrets, and breaching their non-compete clauses.  Cotiviti sought preliminary and permanent injunctive relief as well as monetary damages.  *Id.*, 18–19.  The defendants did not respond to the State Action, Doc. 27, 33, but did file motions to extend the time to respond and a request to transfer the case to the Commercial Division of the New York Supreme Court, *id.*  After the court granted this transfer, Cotiviti voluntarily dismissed the State Action.  *Id.*

After dismissal of the State Action, Cotiviti commenced this diversity case on April 1, 2020, against the same defendants as those in the State Action, with the addition of Magnotta.  Doc. 1.  The initial complaint alleged the same causes of action as the State Action but added additional claims of tortious interference with business relationships and breach of the duty of loyalty.  These two new claims, however, were asserted with

---

[3] Cotiviti does not state when Defendants began working for HMS.

respect to the defendants' employment with a previously unidentified employer called "MMA" rather than Cotiviti.  *Id.*, ¶¶ 95, 104.  As with the State Action, the initial complaint sought preliminary and permanent injunctive relief as well as monetary damages.  Doc. 1, 19.

On May 1, 2020, Cotiviti filed an Amended Complaint, Doc. 21, now alleging misappropriation under the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. § 35-50 *et. seq.*, and the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, and adding claims for breach of the covenant of good faith and fair dealing and unjust enrichment.  Cotiviti also added Rathke as a defendant.  Presumably to preserve this Court's diversity jurisdiction, Cotiviti removed Garrett as a defendant.[4]

On June 15, 2020, Defendants filed the instant motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and for costs pursuant to Rule 41(d). Doc. 25.

## II.   LEGAL STANDARDS

### A.  Motion to Dismiss under Rule 12(b)(6)

When reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court is required to "accept as true the facts alleged in the complaint, drawing all reasonable inferences in favor of the plaintiff" to determine whether plaintiff has properly stated a claim upon which relief can be granted.  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  But this requirement does not apply to legal conclusions, recitals of the elements of a cause of action, bare assertions, or conclusory allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681, 686 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007)).  Instead, to satisfy the pleading standard under Rule 8, a complaint must contain sufficient factual matter to state a claim to relief that is plausible — not merely possible — on its face.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570).

---

[4] Defendants warned Cotiviti of the lack of complete diversity — because both Cotiviti and Garrett are domiciled in Georgia — in their letter requesting a pre-motion conference on their proposed motion to dismiss the initial complaint.  Doc. 15, 1.

Only certain documents may be considered by a court reviewing a motion to dismiss: the scope of consideration is "limited to the factual allegations in plaintiffs' [ ] complaint . . . to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (citation omitted). A complaint is also deemed to include any documents that "although not incorporated by reference, are integral to the complaint." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citation omitted).

### B. Motion for Costs under Rule 41(d)

Federal Rule of Civil Procedure 41(d) provides:

> Costs of a Previously Dismissed Action. If a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court:
>
> (1) may order the plaintiff to pay all or part of the costs of that previous action . . . .

A court may grant the relief prescribed in Rule 41(d) when a plaintiff, after voluntarily dismissing a state court action, subsequently files a federal action asserting claims that "depend on the same core showing" as the claims in the initial action. *Preferred Freezer Servs., LLC v. Americold Realty Tr.*, No. 19 Civ. 2926 (VSB), 2020 WL 774132, at *2 (S.D.N.Y. Feb. 18, 2020) (citing *Horowitz v. 148 S. Emerson Assocs. LLC*, 888 F.3d 13, 23–24 (2d Cir. 2018)). This issue arises when the second action is "predicated on the same facts," even if the "two actions involve different theories of recovery or distinct forms of relief." *Id.* (citing *Horowitz*, 888 F.3d at 23–24). In deciding whether to award costs under Rule 41(d), courts consider the plaintiff's motives in dismissing the initial action and the presence of bad faith, given Rule 41(d)'s "clear and undisputed [purpose] as a deterrent to forum shopping and vexatious litigation." *Horowitz*, 888 F.3d at 25 (citations omitted). Because of this deterrence function, courts may award attorneys' fees

as part of Rule 41(d) costs along with normal litigation expenses. *Id.* at 25–26. Finally, courts in this Circuit often limit costs and attorneys' fees to "compensation for work that cannot be used in a second . . . action." *See, e.g.*, *Preferred Freezer*, 2020 WL 774132, at *3, 4; *Pelczar v. Pelczar*, No. 16 Civ. 55 (CBA) (LB), 2017 WL 3105855, at *2 (E.D.N.Y. July 20, 2017); *Adams v. N.Y. State Educ. Dep't*, 630 F. Supp. 2d 333, 346 (S.D.N.Y. 2009).

## III.   DISCUSSION

As a threshold matter, the Court must address the issue of which state's substantive law should apply to Cotiviti's claims. Cotiviti argues that Connecticut law should apply to the state claims pursuant to the choice-of-law provision in Section 7 of the Rathke Agreement, Doc. 21 ex. A, and Section 6 of the RSU Restrictive Covenants, Doc. 21 ex. B to E. Defendants contend that the Court should disregard these choice-of-law provisions because Connecticut bears no "reasonable relation" to the parties or the contracts at issue, and instead believe that Georgia law should apply because Cotiviti is domiciled in the state and is the likely locus of the alleged misappropriation of trade secrets. Doc. 26, 15–16 (citing *A.S. Rampell, Inc. v. Hyster Co.*, 3 N.Y.2d 369, 381 (1957)). The Court recognizes that because a "choice of law analysis is fact intensive, courts often decline to make a choice of law determination at the motion to dismiss stage." *Holborn Corp. v. Sawgrass Mut. Ins. Co.*, 304 F. Supp. 3d 392, 398 (S.D.N.Y. 2018) (citation omitted). But when facts necessary to make that determination are sufficiently clear, courts in this District have engaged in this analysis at the motion to dismiss stage. *See, e.g.*, *id.*; *Patel v. N.Y. Life Ins. Co.*, No. 11 Civ. 4895 (JPO), 2012 WL 1883529, at *3 (S.D.N.Y. May 21, 2012).

The choice-of-law rules that must be applied in a case brought under diversity jurisdiction are those of the forum state — in this case, New York. *GlobalNet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006); *see also Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 332 (2d Cir. 2005)

("The validity of a contractual choice-of-law clause . . . must be decided . . . under the relevant forum's choice-of-law rules governing the effectiveness of such clauses."). Under New York law, "absent fraud or a violation of public policy, courts will uphold a choice-of-law clause so long as the state selected has sufficient contacts with the transaction." *Innovative BioDefense, Inc. v. VSP Techs., Inc.*, No. 12 Civ. 3710 (ER), 2013 WL 3389008, at \*3 (S.D.N.Y. July 3, 2013) (citing *Int'l Mins. & Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996)). Even if such a clause is enforced, however, the contractual choice-of-law clause does not reach tort claims."[5] *Fin. One*, 414 F.3d at 334 (citing *Knieriemen v. Bache Halsey Stuart Shields, Inc.*, 427 N.Y.S.2d 10, 12–13 (1st Dep't 1980), as the "leading New York case" on this issue). Here, Plaintiff alleges certain claims sounding in contract and others sounding in tort.

When a choice-of-law clause is disregarded, courts engage in traditional conflict-of-law analysis, the first step of which is to determine "whether there is an actual conflict of laws on the issues presented." *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011). "An actual conflict of law exists if 'the applicable law from each jurisdiction provides different substantive rules,' and the differences 'have a significant *possible* effect on the outcome of the trial.'" *Holborn*, 304 F. Supp. 3d at 398 (internal citation omitted) (quoting *Fin. One*, 414 F.3d at 331).

Upon finding actual conflict, courts must apply the appropriate choice-of-law test depending on whether the claims sound in contract or tort. *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 394 (2d Cir. 2001). For contract claims, courts apply the "center of gravity" or "grouping of contacts" analysis, which looks at the contacts between the

---

[5] In limited cases, New York courts construe a choice-of-law provision to encompass non-contractual claims if the provision is "sufficiently broad so as to encompass the entire relationship between the contracting parties." *Innovative BioDefense*, 2013 WL 3389008, at \*4 (internal quotation marks omitted) (citing *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996)). Language that the agreement itself is to be construed or governed by a particular law is too narrow to support such an interpretation. *Id.* Because the choice-of-law provisions in the Rathke Agreement and RSU Restrictive Covenants only state that these documents "shall be construed and enforced in accordance with Connecticut law," those provisions cannot govern the choice-of-law analysis for Cotiviti's non-contractual claims.

disputed contract and the relevant states. *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 226 (1993). Factors to consider in this analysis include "the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties." *Id.* at 227; *see also N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43 (2d Cir. 1999) (applying this test in the trade secrets context). For tort claims, courts in New York apply the "interests test," which looks at the "law of the jurisdiction having the greatest interest in the litigation." *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 284 (2d Cir. 2006). "The states' interests are defined primarily by the parties' domiciles and the locus of the tort." *Holborn*, 304 F. Supp. 3d at 398 (internal quotation marks omitted).

The Court begins with the presumption that the choice-of-law provisions selecting Connecticut should govern the contractual claims in this case. *Int'l Mins.*, 96 F.3d at 592. These would include both the breach of contract (Count One) and the breach of the implied covenant of good faith and fair dealing (Count Two) claims. *Patel*, 2012 WL 1883529, at *3 (finding that breach of the implied covenant is treated as a contractual claim under New York law for choice-of-law purposes). However, the Defendants raise important concerns over the lack of "sufficient contacts" between Connecticut and any of the allegations in the Amended Complaint. Namely, the Amended Complaint does not allege that any party is a Connecticut citizen, that the relevant contracts in this case were negotiated or executed in Connecticut, that any defendant was ever employed in Connecticut, or that tortious conduct against or injury to Cotiviti occurred in Connecticut. In response, Cotiviti asserts that one of the companies that merged in 2014 to create Cotiviti Holdings, iHealth Technologies, was based in Wilton, Connecticut, Doc. 21, ¶ 27; Doc. 27, 20, and that Cotiviti is a "nationwide compan[y] with offices throughout the United States" (though it does not assert that any of its offices are located in Connecticut), Doc. 27, 20; *see also* Doc. 21, ¶ 4. Neither the Verscend Merger nor the location of iHealth Technologies's headquarters were asserted in the Amended

Complaint, therefore they should not be considered in determining whether to dismiss. *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (noting that on a Rule 12(b)(6) motion, the court should only consider matters in the complaint, exhibits, documents of which judicial notice may be taken, and documents integral to the complaint). Even if considered, neither of the two facts presented materially connect Cotiviti, or any of its claims, to Connecticut, so the Court will not abide by the choice-of-law clauses and will proceed to the choice-of-law analysis.

The first step is to determine whether there are actual conflicts between the laws of Connecticut and Georgia with respect to Cotiviti's claims.[6] But for the same reasons the Court will not enforce the Connecticut choice-of-law clauses, the Court can also omit Connecticut from the conflicts analysis. That is to say, even if the Court finds conflicts between Connecticut and Georgia law, Cotiviti has not presented *any* facts that support application of Connecticut law using either the center of gravity test (contract claims) or the interests test (tort claims). As noted *supra* Part I, Cotiviti's claims rest on four actions by the Defendants: employment with a Cotiviti competitor, misappropriation of trade secrets, solicitation of clients, and solicitation of employees. But when either the center-of-gravity test or the interests test are applied to these allegations, none of the relevant factors support application of Connecticut law. The only remaining relevant jurisdiction is Georgia, where Cotiviti has its principal place of business, Doc. 21, ¶ 9, and Cotiviti's trade secrets may be presumed to have originated, *see Innovative BioDefense*, 2013 WL 3389008, at *6. While the Court has not been presented with sufficient information to consider the other factors in the choice-of-law tests, such as the location of Defendants' allegedly tortious conduct or the place where the contracts were

---

[6] Generally speaking, a court sitting in diversity applies the substantive law of the forum state, here New York, or includes it as an option in the choice-of-law analysis. *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005). However, neither party has argued for application of New York law and the Court does not discern any connections between this state and the claims apart from the forum selection clause. Thus, the Court finds it reasonable to omit New York from the choice-of-law analysis.

negotiated and executed, there appears to be no jurisdiction other than Georgia that has a significant relationship to this litigation.  Doc. 26, 16.  Accordingly, the Court will apply Georgia law to Cotiviti's claims.

### A.  Breach of Contract (Count One)

Cotiviti's first cause of action is for breach of contract:  Cotiviti alleges that Rathke breached the Rathke Agreement, Doc. 21 ex. A, and that the RSU Defendants breached the RSU Restrictive Covenants.  Doc. 21 exs. B through E.

#### 1.  *The Merger Agreement*

Defendants ask the Court to take judicial notice of the Merger Agreement between Cotiviti Holdings and Verscend so the Court can assess whether the Verscend Merger terminated the RSU Defendants' obligations under the Restrictive Covenants.  Because the Merger Agreement is not incorporated into the Amended Complaint by reference or attached as an exhibit therein, the Court may only consider the document if it can be judicially noticed or is integral to the complaint.  Judicial notice may be taken of documents that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2), such as documents required by law to be filed with the SEC.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (taking judicial notice of SEC filings where plaintiff alleged violations of federal securities laws predicated on such filings).  Documents are integral to a complaint when, among other things, they are necessary to a plaintiff's ability to pursue its cause of action, *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004), or the complaint "relies heavily upon [their] terms and effect," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citation omitted).

The Court takes judicial notice of the Merger Agreement and its contents because it was filed with the SEC, much like the "Offer to Purchase" and "Joint Proxy Statement" judicially noticed by the *Kramer* court.  *Kramer*, 937 F.2d at 774 (contrasting major

purchase and merger documents with company press releases or announcements at shareholder meetings, the latter of which would likely not be judicially noticed). Defendants also meet the procedural hurdle of Federal Rule of Evidence 201(e) by proffering the Merger Agreement in the motion to dismiss, thereby putting Cotiviti on notice that the Court might consider it.  *Id.*  For its part, Cotiviti did not address the issue of judicial notice in its opposition brief.  Doc. 27, 11.  Accordingly, the Court takes judicial notice of the Merger Agreement for its content but not for its truth.  *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).[7]

Defendants point to two provisions of the Merger Agreement that could be interpreted as terminating the enforceability of the RSU Restrictive Covenants.  As discussed *supra* Part I, Section 3.05(b) of the Merger Agreement states, "[E]ach Company *RSU Award* that remains outstanding . . . shall (i) vest in full, and (ii) by virtue of the Merger . . . *be cancelled and terminated* . . . and converted into the right to receive [a cash payout]" (emphasis added).  And Section 3.05(d) states Cotiviti's responsibility to "take all necessary action to ensure that [Cotiviti] will not be bound at the Effective Time by any options, stock appreciation rights, units or other right, *awards or arrangements under any stock incentive plan* of the Company" (emphasis added), and that "subject to the consummation of the Merger . . . [*Cotiviti's*] *2016 Equity Incentive Plan shall terminate effective immediately* prior to the Effective Time" (emphasis added). Defendants argue that by terminating the RSU Awards, the Merger Agreement also terminated the RSU Agreements, and with it the attached RSU Restrictive Covenants, that conditioned Defendants' receipt of these awards.  Doc. 26, 10–13.  They also argue

---

[7] Defendants also contend that the Merger Agreement is "integral" to the Amended Complaint because it evidences a merger that links the former Cotiviti Holdings — with which the RSU Defendants signed the RSU Restrictive Covenants — to the current plaintiff, Cotiviti, Inc.  Doc. 28, 3–4.  Cotiviti argues that the Merger Agreement is not integral because it did not directly rely on any of its terms to set out the allegations in the Amended Complaint.  Doc. 27, 11.  The Court is not aware of, and the parties have not provided, case law addressing whether documents may be considered "integral" because they led to the creation of a plaintiff or other party.  Because the Court will consider the Merger Agreement through judicial notice, it need not determine whether it is also integral to the Amended Complaint.

that because the RSU Agreements are "subject to" the Incentive Plan, Doc. 28 ex. A, § 15.2, the Incentive Plan's termination must have terminated the RSU Agreements and RSU Restrictive Covenants. Doc. 28, 5–6. Cotiviti concedes that the Incentive Plan and RSU Awards were terminated by the "plain language" of the Merger Agreement but argues that the RSU Restrictive Covenants exist separately from the RSU Awards to which they relate. Doc. 27, 12–13. According to Cotiviti, the RSU Defendants took on the obligations imposed by the RSU Restrictive Covenants as consideration for the RSU Awards, and these obligations unambiguously continued to bind the RSU Defendants after the Incentive Plan itself was terminated. *Id.*

While the Merger Agreement does define many terms, the Court disagrees with Cotiviti's contention that the document "leaves no ambiguity for the Court to resolve." *Id.*, 12. For example, the Merger Agreement does not define the term "arrangements" when it states that Cotiviti "shall take all necessary action to ensure that [Cotiviti] will not be bound . . . by any . . . *awards or arrangements* under any stock incentive plan." Merger Agreement § 3.05(d). It is reasonable to interpret the RSU Agreements and accompanying RSU Restrictive Covenants as "arrangements" under which stock incentives were given to the RSU Defendants, in which case they would be terminated by Section 3.05(d). This interpretation is supported by the fact that holders of outstanding RSU Awards were granted a right to receive "RS/RSU Consideration" as a result of the Verscend Merger without any additional restrictive covenants attached — unlike the offering of the RSU Awards in exchange for executing the RSU Agreements. But it is also reasonable to define "arrangements" as some other type of stock ownership right that does not fit into the listed categories of options, stock appreciation rights, and units — and not as a contractual arrangement upon which a stock award might be conditioned. Nevertheless, the ambiguity in Section 3.05 with respect to its effect on the RSU Restrictive Covenants benefit Cotiviti since any ambiguity must be resolved in its favor at the motion to dismiss stage. *Serdaveric v. Centex Homes, LLC*, 760 F. Supp. 2d 322,

328–29 (S.D.N.Y. 2010) (citing *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).  Therefore, the Court will treat the RSU Restrictive Covenants as effective and enforceable for purposes of the instant motion.

      *2.  Cotiviti Failed to Adequately Plead Two of its Claims*

"The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken."  *Oconee Fed. Sav. & Loan Ass'n v. Brown*, 831 S.E.2d 222, 229 (Ga. Ct. App. 2019).  Cotiviti alleges that Defendants breached their respective contracts by engaging in four sets of activities barred by nearly identical provisions in the Rathke Agreement and the RSU Restrictive Covenants:  (1) soliciting Cotiviti employees, (2) soliciting Cotiviti clients, (3) performing "substantially similar professional services" for Cotiviti competitors, and (4) disclosing or misappropriating Cotiviti trade secrets. Two of these allegations are insufficiently pleaded — the breach of contract claim fails with respect to allegations of client solicitation and trade secrets misappropriation but is sustained with respect to allegations of employee solicitation and violation of the non-compete clauses.

Cotiviti provides no factual support for its allegations that the Defendants solicited its clients.  Cotiviti only makes bare assertions that its clients were solicited, or business was diverted away from, Cotiviti Holdings and Cotiviti, without identifying any specific client that was solicited, who solicited the client, or when such solicitation occurred.  *See* Doc. 21, ¶¶ 90, 134.  The Court will not permit Cotiviti to "start with a generic complaint [as to the solicitation claims], then use an invasive discovery process to find and articulate specific claims."  *City of New York v. FedEx Ground Package Sys., Inc.*, No. 17 Civ. 5183 (ER), 2018 WL 4625765, at *5 (S.D.N.Y. Sept. 26, 2018).

Cotiviti also fails to sufficiently plead that the Defendants have disclosed or misappropriated Cotiviti's trade secrets.  While Defendants' respective contracts prohibit disclosure or misappropriation of trade secrets, *see, e.g.*, Doc 21 ex. A., § 2 ("You agree

not to disclose or misappropriate any Cotiviti Trade Secrets . . . ."), Cotiviti's claims of trade secret misappropriation are conclusory, lacking factual matter that would make the claims plausible, not merely possible.  Doc. 21, ¶¶ 7, 90, 107, 108, 122, 129.  Further, the Amended Complaint lacks allegations that Defendants improperly copied or retained documents or other media containing Cotiviti trade secrets that were later disclosed to HMS.  Such allegations are important because it is a "well-settled rule in Georgia that an employee's knowledge gained from his employment with a former employer is not considered to be a trade secret" and disclosure of such intangible information can only be prohibited through a non-compete clause.  *Tilley v. Mac Papers, Inc.*, No. 09 Civ. 897 (TCB), 2009 WL 10669417, at *3 (N.D. Ga. Nov. 2, 2009) (citing *Stone v. Williams Gen. Corp.*, 597 S.E.2d 456, 459 (Ga. Ct. App. 2004), *rev'd on other grounds*, 614 S.E.2d 758 (Ga. 2005)).  Without allegations that Defendants shared Cotiviti's trade secret *documents* with HMS, Defendants would at most be in violation of their non-compete clauses, not the contractual provisions regarding trade secrets.

On the other hand, Cotiviti plausibly alleges that at least one of the Defendants solicited employees away from Cotiviti.  Cotiviti alleges upon information and belief that Magnotta solicited Defendants Deagle, Husband, Rubio, and/or Rathke and also alleges that "at least one Defendant" solicited at least one other Defendant to join him at HMS away from Cotiviti.  Doc. 21, ¶¶ 5, 68, 90, 134.  Unlike the allegation of client solicitation, Cotiviti has identified at least one specific individual, Magnotta, who has allegedly solicited employees.  The Court must accept these factual allegations as true and draw reasonable inferences in favor of Cotiviti.  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

Cotiviti plausibly asserts that Defendants violated the non-compete clauses of their respective contracts, in which Defendants agree not to provide "substantially similar professional services" within most, if not all, of the United States to Cotiviti's competitors.  *See, e.g.*, Doc. 21 ex. A, § 5.  These provisions require alleging more than

just employment with a competitor: they require alleging that a Defendant improperly provided professional services to a Cotiviti competitor substantially similar to those provided to Cotiviti. While Defendants correctly note that Cotiviti did not conduct a thorough comparison of each Defendant's job duties, Cotiviti does allege that each Defendant works for HMS "in a capacity similar to the role he [or she] held at Cotiviti." Doc. 21, ¶¶ 66, 70, 72, 76. Cotiviti also asserts that it "learned" that Rathke and Magnotta work for HMS "in a competitive capacity." *Id.*, ¶ 79. Together with the allegation that HMS is a direct competitor to Cotiviti, *id.*, ¶ 5, these allegations "raise a reasonable expectation that discovery will reveal evidence" that Defendants provided similar services to HMS as they did to Cotiviti, in breach of the non-compete clauses. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

For these reasons, the motion to dismiss is denied with respect to all alleged violations of the Defendants' respective contracts except violations of their employee solicitation and non-compete clauses.

### B.  Breach of Implied Covenant of Good Faith and Fair Dealing (Count Two)

Under Georgia law, every contract implies a covenant of good faith and fair dealing in its performance and enforcement. *Oconee*, 831 S.E.2d at 231. This implied covenant "cannot be breached apart from the contract provisions it modifies and therefore cannot provide an independent basis for liability." *Id.* Here, Cotiviti alleges that it performed its obligations under Defendants' respective contracts and expected to receive their benefits, but the Defendants breached the implied covenant "by unlawfully competing with Cotiviti." Doc. 21, ¶¶ 95–97.

Since Cotiviti does not adequately plead breach of contract with respect to solicitation of clients and misappropriation of trade secrets, the breach of the implied covenant cannot be sustained as to those contractual provisions. *See Ceasar v. Wells Fargo Bank, N.A.*, 744 S.E.2d 369, 374 (Ga. Ct. App. 2013) ("Because the [plaintiffs] did not assert a breach of contract claim, their claim for breach of the implied covenant of

good faith and fair dealing failed as a matter of law.").  On the other hand, because Cotiviti does state plausible claims that Defendants breached the non-compete and employee solicitation clauses of their contracts, the corresponding breach of implied covenant of good faith and fair dealing claims survive as well.  *See TechBios, Inc. v. Champagne*, 688 S.E.2d 378, 381 (Ga. Ct. App. 2009) ("As found above, TechBios has adequately set forth a claim of breach of contract of the teaming agreement, and duties imposed by the teaming agreement also serve as a sufficient basis for its claim that Champagne and Taos breached the implied covenant of good faith and fair dealing.").[8]

### C.  Misappropriation of Trade Secrets under the Connecticut Uniform Trade Secrets Act (Count Three)

As discussed above, Georgia, not Connecticut, governs tort claims in this case because Georgia clearly has the greatest interest in this litigation.  Accordingly, this cause of action should be dismissed because it is alleged under the wrong state's trade secrets statute.  *Marshall v. Hyundai Motor Am.*, 334 F.R.D. 36, 58 (S.D.N.Y. 2019) (warning a plaintiff that her claim under Pennsylvania state law will be dismissed because New Jersey law applies to the action).

Even if the claim were not dismissed on this basis or were re-pleaded under the Georgia Trade Secrets Act, it would still fail because Cotiviti has insufficiently pleaded actual or threatened misappropriation of trade secrets.  The Georgia Trade Secrets Act offers injunctive relief for actual or threatened disclosure of protected trade secrets, and damages for actual misappropriation.  Ga. Code Ann. § 10-1-762, -763.  As discussed *supra* Part III.A.2, Cotiviti has failed to sufficiently plead actual misappropriation.  It has also failed to adequately plead facts supporting threatened disclosure.  The only basis Cotiviti provides for any sort of threatened disclosure is the so-called "inevitable

---

[8] The Court notes that if Connecticut law applied, the claim would fail in its entirety because Cotiviti has not alleged facts leading to an inference of bad faith.  *See Keller v. Beckenstein*, 979 A.2d 1055, 1063 (Conn. App. Ct. 2009) (citation omitted) ("To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith.").

disclosure doctrine," whereby Cotiviti claims that it would be inevitable for Defendants to misappropriate Cotiviti's trade secrets if employed by a competitor like HMS:

> [I]t would be extremely difficult, if not impossible, for Defendants to perform any duties for HMS without making use of the . . . [Cotiviti] trade secret information. . . . Given Defendants' senior management positions at Cotiviti, it would be impossible for them to undertake employment with a direct competitor without making use of Cotiviti's confidential, trade secret, and proprietary information."

Doc. 21, ¶¶ 80, 81.  Defendants cite *Holton v. Physician Oncology Servs., LP*, 742 S.E.2d 702, 706 (Ga. 2013), to argue that Georgia case law prevents the use of the inevitable disclosure doctrine to obtain any injunctive relief, meaning that "inevitable disclosure" cannot serve as the basis for a finding of either actual or threatened misappropriation. However, the *Holton* court held merely that the inevitable disclosure doctrine cannot support injunctive relief by itself, while declining to address whether the inevitable disclosure is just one way to show threatened misappropriation.  742 S.E.2d at 706. Nevertheless, this Court is hesitant to apply the doctrine given the lack of favorable treatment by Georgia courts and Cotiviti's failure to provide factual support for its bare assertions that misappropriation is inevitable.  Cotiviti's allegations lack specific comparisons between Defendants' responsibilities at HMS and Cotiviti that make it plausible that "the employee[s] will be unable to complete those responsibilities without relying on the former employer's trade secrets."  *Id.* at 705 (noting factors that courts in other states use when applying the inevitable disclosure doctrine).  For these reasons, the Court dismisses Cotiviti's claim for violation of state trade secrets laws.

### D.  Misappropriation of Trade Secrets under the Defend Trade Secrets Act (Count Four)

As with the Georgia Trade Secrets Act, the federal Defend Trade Secrets Act provides injunctive relief to prevent actual or threatened misappropriation and damages for "actual loss caused by the misappropriation."  18 U.S.C. § 1836(3)(A)–(B).  Because

Cotiviti has failed to adequately plead actual or threatened misappropriation, *supra* Parts III.A and C, the Court dismisses this claim.

### E.  Unfair Competition (Count Five)

Cotiviti claims that Defendants engaged in unfair competition by improperly using Cotiviti trade secrets and soliciting its clients and employees.  Doc. 21, ¶ 134. Defendants argue that Cotiviti has failed to sufficiently plead that Defendants have engaged in any of these behaviors.  Doc. 26, 21.

In Georgia, claims for unfair competition arise under the state's common law. *ITF, S.P.A. v. Boucheron (USA) Ltd.*, No. 04 Civ. 2974 (CC), 2005 WL 8155017, at *1 (N.D. Ga. Aug. 1, 2005).  "In Georgia, the test for a claim of unfair competition is whether the goods or business of one are passed off as the goods or business or another." *Id.* at *3 (citing *Hayes w. Hallmark Apartments, Inc.*, 207 S.E.2d 197 (Ga. 1974)).  This is a narrow conception of unfair competition that focuses on the goods or business offered to the public, not necessarily how such goods or business are derived (such as through the misappropriation of the trade secrets of a competitor).  As an initial matter, the Court has already found that Cotiviti has not alleged facts sufficient to make plausible the assertions of misappropriation of trade secrets or solicitation of clients, so these assertions cannot serve as the basis for a viable claim of unfair competition.  But even if these allegations were sufficiently pleaded, they do not give rise to a claim of unfair competition under Georgia law because there is no allegation that the Defendants or their new employer, HMS, passed off Cotiviti's "goods" or "services" as their own.  The allegations of employee solicitation likewise do not involve passing off Cotiviti's goods or services as HMS's own.  For these reasons, the unfair competition claim fails.

### F.  Tortious Interference with Business Relationships (Count Six)

Cotiviti claims that Defendants used Cotiviti trade secrets and solicited its clients and employees to tortiously interfere with Cotiviti's business relationships.  Doc. 21, ¶ 134.  To prove tortious interference with a business relationship, a plaintiff must show

that the defendant:  "(1) acted improperly and without privilege; (2) acted purposefully and maliciously with the intent to injure; (3) induced a third party not to enter into or continue a business relationship with the plaintiff; and (4) caused the plaintiff some financial injury."  *Meadow Springs, LLC v. IH Riverdale, LLC*, 747 S.E.2d 47, 50 (Ga. Ct. App. 2013) (citation omitted).  Courts interpret malice in this context liberally as "any unauthorized use" or "interference without legal justification or excuse," *Renden, Inc. v. Liberty Real Estate Ltd. P'ship III*, 444 S.E.2d 814, 817 (Ga. Ct. App. 1994).

Cotiviti's assertions of trade secret misappropriation and client solicitation do not serve as a basis for this claim because they are insufficiently pleaded and lack the necessary "factual enhancement" to make them plausible.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  Cotiviti has not identified any specific client or employee relationship which it has lost through Defendants' alleged actions.  Further, Cotiviti fails to sufficiently plead the elements of malice and financial injury.  No substantiating facts or circumstances are presented, apart from conclusory assertions, of Defendants' malicious intentions with which they allegedly solicited Cotiviti clients or employees.[9] *Meadow Springs*, 747 S.E.2d at 50 (affirming summary judgment against plaintiff for tortious interference where no facts were asserted to support malice).  Financial injury has also not been sufficiently pleaded because Cotiviti has not asserted any specific or approximate dollar amount it has lost due to Defendants' alleged interference of its business relationships.  Accordingly, the tortious interference claim is dismissed.

### G.  Breach of the Duty of Loyalty (Count Seven)

Under Georgia law, employees who may bind their employer have been found to have a fiduciary duty to such employer, giving rise to a duty of loyalty that is breached when an employee uses her position for personal gain at the employer's expense. *Tronitech, Inc. v. Shealy*, 547 S.E.2d 749, 758 (Ga. Ct. App. 2001), *overruled on other*

---

[9] *See supra* n.8.

*grounds by Williams Gen. Corp. v. Stone*, 614 S.E.2d 758 (Ga. 2005); *see also Jennette v. Nat'l Cmty Dev. Servs.*, 520 S.E.2d 231, 234 (Ga. Ct. App. 1999) (same).  The employee under the duty of loyalty must not "make a personal profit from the principal's business . . . or from the knowledge obtained from the relationship, to the principal's injury."  *Jennette*, 614 S.E.2d at 234 (citations omitted).  Crucially, "actions taken after leaving one's employment do not constitute a breach of fiduciary duty."  *Cont'l Mar. Servs., Inc. v. Mar. Bureau, Inc.*, 621 S.E.2d 775, 778 (Ga. Ct. App. 2005).

Cotiviti fails to assert which specific actions Defendants took that violated their duty of loyalty, stating broadly that "Defendants willfully and intentionally breached their duty of loyalty to Plaintiff by engaging in *the conduct herein alleged*, in conscious disregard of Plaintiff's rights."  Doc. 21, ¶ 141.  Further, the main sets of actions alleged by Cotiviti — competition, solicitation, and misappropriation of trade secrets — cannot sustain this cause of action because they are alleged to have occurred *after* Defendants' employment with Cotiviti.  Therefore, this claim is dismissed.

### H.  Unjust Enrichment (Count Eight)

"The theory of unjust enrichment applies when there is no legal contract and when there has been a benefit conferred which would result in an unjust enrichment unless compensated."  *May v. S.E. GA Ford, Inc.*, 811 S.E.2d 14, 18 (Ga. Ct. App. 2018).  The claim may not be considered if a valid contract exists that governs the allegedly tortious activity.  *Id.*  In this case, the Court deems that the RSU Restrictive Covenants and Rathke Agreement are still enforceable, and they fully govern the actions allegedly taken by Defendants.  The Court dismisses the claim of unjust enrichment.

### I.  Leave to Amend

In its opposition to the instant motion, Cotiviti did not request leave to amend its complaint.  However, the Court recognizes that leave to amend should be given freely "when justice so requires," Fed. R. Civ. P. 15(a)(2).  This includes granting leave to amend *sua sponte* where, as here, the Court has dismissed most of Cotiviti's claims on

the basis of inadequate pleading.  *S. Ill. Laborers' & Emps. Health & Welfare Fund v. Pfizer, Inc.*, 08 Civ. 5175 (KMW), 2009 WL 3151807, at *8 (S.D.N.Y. Sept. 30, 2009) (granting *sua sponte* leave to amend certain claims because they were inadequately pleaded).  Of course, leave to amend should not be given if it would be futile; that is, "if it appears that plaintiff cannot address the deficiencies identified by the court and allege facts sufficient to support the claim."  *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 347 Fed. App'x 617, 622 (2d Cir. 2009).  In this case, the Court does not deem amendment futile because it is possible that Cotiviti could provide some of the missing facts necessary to support its claims through further investigation.  Plaintiff is therefore given 30 days from the entry of this Opinion & Order to file a Second Amended Complaint.

### J.   Defendants Are Entitled to Costs under Rule 41(d)

Defendants request Rule 41(d) costs because Cotiviti voluntarily dismissed the State Action, which was predicated on the same core factual allegations as this federal action:  solicitation, providing similar services to a competitor, and misappropriating trade secrets.  Doc. 26, 23–24.  As evidence of the forum shopping that Rule 41(d) is meant to deter, *Horowitz v. 148 S. Emerson Assocs. LLC*, 888 F.3d 13, 25 (2d Cir. 2018) ("Rule 41(d)'s purpose is clear and undisputed:  to serve as a deterrent to forum shopping and vexatious litigation." (internal quotation marks omitted)), Defendants note that Cotiviti's initial complaint included defendant Garrett from the State Action — which obviously destroyed diversity jurisdiction — and pleaded an unknown employer named "MMA."  *Id.* at 23.  Cotiviti argues that costs should not be awarded because it did not dismiss the State Action "in reaction to unfavorable rulings" and little to no costs have been expended by Defendants in defending the State Action.  Doc. 27, 33.

Clearly, the instant action "depend[s] on the same core showing" as the State Action, *Preferred Freezer Servs., LLC v. Americold Realty Tr.*, No. 19 Civ. 2926 (VSB), 2020 WL 774132, at *2 (S.D.N.Y. Feb. 18, 2020) (citation omitted), because they both

rely on proving Defendants engaged in the same activities proscribed by the Defendants' respective contracts. *Compare* Doc. 1, ¶¶ 71, 84, 91, *and* Doc. 21, ¶¶ 90, 107, 129, *with* Doc. 26 ex. A, ¶¶ 65, 78, 85. This alone meets the plain criteria of Rule 41(d) for an award of costs, including attorneys' fees, incurred in the State Action. Further, Cotiviti's actions should be deterred because its failure to remove the non-diverse defendant Garrett when initiating the federal action hints at forum shopping; Cotiviti simply rehashed the claims in its State Complaint without making an effort to tailor its new complaint to the jurisdictional requirements of the federal trial court in which it filed.

The Court nevertheless lacks sufficient information at this time to rule on the specific amount that is recoverable. In similar cases, courts in this Circuit have "giv[en] the parties an opportunity to agree on reasonable costs and make any submissions as to the size of the award." *Preferred Freezer*, 2020 WL 774132, at *4 (requesting an affidavit from defendant proposing reasonable costs before finalizing an award); *see also Horowitz v. 148 S. Emerson Assocs., LLC*, No. 16 Civ. 2741 (SJF) (AKT), 2016 WL 11508981, at *12 (E.D.N.Y. Oct. 19, 2016) (same), *aff'd in part, vacated in part on other grounds*, 888 F.3d 13 (2d Cir. 2018). The Court does note Cotiviti's concession that Defendants "filed several extensions of time to respond [to the State Action] . . . and a request to move the case to the Commercial Division." Doc. 27, 33. These motions or requests bear no relation to and cannot be used in the instant case, thus Defendants should be compensated for the work done to prepare them. *See Adams v. N.Y. State Educ. Dep't*, 630 F. Supp. 2d 333, 346 (S.D.N.Y. 2009) (awarding attorneys' fees for a discovery motion in a previously dismissed case that could not be re-used). There may be other work that Defendants or their counsel undertook for the State Action that cannot reasonably be used in this case, and such expenses would justify additional attorneys' fees. *Preferred Freezer*, 2020 WL 774132, at *4.

**IV.     CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss under Rule 12(b)(6) is DENIED with respect to Counts I and II for alleged solicitation of employees and alleged violations of Defendants' non-compete clauses, and GRANTED as to Counts I and II for all other alleged violations of Defendants' respective contracts, and as to all remaining counts.  These claims are dismissed without prejudice and the Court grants Cotiviti leave to amend its complaint no later than **December 21, 2020**.

Defendants' motion for costs under Rule 41(d) is GRANTED.   No later than **December 3, 2020**, Defendants shall serve on Cotiviti an affidavit delineating the reasonable costs, including attorneys' fees, they incurred in defending the State Action for work that cannot be reused in this case.  No later than **December 17, 2020**, Cotiviti and Defendants shall file a joint letter of no more than five (5) pages proposing an agreement as to what constitutes reasonable costs in light of Defendants' affidavit.

The Clerk of the Court is respectfully directed to terminate the motions, Doc. 25.

It is SO ORDERED.

Dated:     November 19, 2020
           New York, New York

_____
           EDGARDO RAMOS, U.S.D.J.